NAM SIK KANG AND SANG I. KANG, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Nam Sik Kang v. Commissioner
Docket No. 12846-91
United States Tax Court
T.C. Memo 1993-601; 1993 Tax Ct. Memo LEXIS 610; 66 T.C.M. (CCH) 1626; December 20, 1993, Filed *610 For petitioner: Kenneth A. Thomas. For respondent: Richard D. Ames. BEGHE
BEGHE
MEMORANDUM FINDINGS OF FACT AND OPINION BEGHE, Judge: Respondent determined the following deficiencies in and additions to petitioners' Federal income tax: Additions to tax
Years
Deficiencies
Sec. 6653(a)
Sec. 6661
Sec. 6662
1987
$ 29,858
$ 1,493
$ 7,465
-0-
1988
19,800
990
4,950
-0-
1989
17,432
-0-
-0-
$ 3,486
All section references are to the Internal Revenue Code in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure. All adjustment amounts, deposits, and expenses have been rounded to the nearest whole dollar. The deficiencies were based on adjustments to income as follows: 1987
1988
1989
Interest income
-0- -0-
$    335
Wife's Schedule C:
Gross receipts
$ 11,983 $ 10,438
8,741
Purchases
10,643 2,098
5,420
Depreciation
6,025 78
78
Wage expense
12,000 -0-
-0-
Wife's reported W-2 wages
(12,000)
-0-
-0-
Husband's Schedule C:
Gross receipts
50,511 45,970
34,072
Expenses
1,351 2,720
5,713
Capital gains and losses
-0- 9,906
-0-
Total adjustments
80,513 71,210
54,359
*611 Petitioners have agreed to respondent's adjustments regarding wages, unreported interest income, unreported capital gains, and excess depreciation. The remaining issues are: (1) Whether respondent is entitled to use the bank deposits method to reconstruct petitioners' business income; (2) if respondent is so entitled, which bank deposits are from nontaxable sources; (3) whether petitioners substantiated their business expenses; (4) whether petitioners are liable for additions to tax under sections 6653(a) and 6661 for 1987 and 1988; (5) whether petitioners are liable for an addition to tax under section 6662 for 1989. After holding that respondent is entitled to use the bank deposits method, we apply that method to redetermine petitioners' taxable and nontaxable receipts. We also redetermine petitioners' business expenses. Having found that petitioners' additional taxable income for each year in issue was less than determined by respondent but more than conceded by petitioners, we sustain respondent's determinations of additions to tax, subject to computation under Rule 155. FINDINGS OF FACT The parties have stipulated some of the facts, and unless otherwise noted, the Stipulation *612 of Facts, the Supplemental Stipulation of Facts, and all exhibits referred to in the stipulations are incorporated in this opinion. Nam Sik and Sang I. Kang (petitioners) emigrated from South Korea in 1977 and became U.S. citizens in 1983. During the years in issue, petitioners resided in Dallas, Texas, but they resided in Plano, Texas, when they filed their petition. When petitioners first moved to Dallas, Nam Sik Kang (Mr. Kang) was employed by a contractor as a carpenter. Mr. Kang later started his own construction-repair business (Remodeling), which he operated during the years in issue. Mr. Kang did not keep his own business records. Instead, he handed over to Sang I. Kang (Mrs. Kang) most of the payments he received, and all Forms 1099 and other business-related mail. He spoke very little English, did not understand the U.S. tax system, and relied on Mrs. Kang to handle everything. Mrs. Kang had 8 years of schooling in the small town in South Korea where her parents owned a farm. When Mrs. Kang was 17 years old, she left her parents' home to attend a technical college. After finishing technical college, she studied clothes design and fashion. When Mrs. Kang was 22 *613 years old, she opened a dressmaking shop, which she operated for 4 years until she married Mr. Kang. Before Mrs. Kang emigrated to the United States with Mr. Kang, she sold the dressmaking shop for about $ 40,000 and lent the proceeds to people in South Korea. From 1978 to 1985, Mrs. Kang worked in her home in Dallas as a seamstress. In 1985 she opened a tailor shop, which she operated quite successfully for approximately 1 year. In April 1986, she sold the tailor shop for $ 10,000 and, before receiving any proceeds of the sale, purchased Manna Sandwich Shop (Manna) for $ 60,000. The purchase price consisted of $ 45,000 from savings, $ 5,000 from a cash hoard (see infra p. 8), and $ 10,000 from a purchase money loan. Petitioners had accumulated the savings by working hard, living frugally, and saving $ 1,000 to $ 1,500 per month, primarily from Mrs. Kang's sewing business. Manna's previous owner showed Mrs. Kang how to operate the sandwich shop, but Mrs. Kang did not take over the previous owner's accounting system. Petitioners' tax return preparer, a certified public accountant, did not instruct Mrs. Kang about keeping the necessary accounting records. Nevertheless, *614 Manna's cash receipts and disbursement ledgers were generally accurate. For the years in issue, petitioners filed joint returns and reported income from their businesses on Schedules C of their Forms 1040. On the respective Schedules C, petitioners reported business gross receipts for the years in issue as follows: 1987
1988
1989
Gross receipts reported:
Manna
$  67,820
$ 56,021
$ 46,681
Remodeling
36,726
32,000
35,856
104,546
88,021
82,537
Petitioners failed to explain deposits that they initially alleged were not income and conceded additional gross receipts. The unexplained and conceded amounts totaled $ 23,573 in 1987, $ 14,277 in 1988, and $ 8,387 in 1989. Although petitioners were cooperative during the audit, they did not provide the revenue agent with complete bank records or any accounting records for Remodeling. Because respondent was unable to determine petitioners' gross receipts from petitioners' records, respondent used the bank deposits method to determine gross receipts. During the audit, respondent's revenue agent asked Mrs. Kang how much cash she had on hand at the beginning of 1987, but did not ask the same question about the beginning *615 of 1988 or 1989. Mrs. Kang understood the question to refer to working capital for Manna and Remodeling. Therefore, she told the revenue agent that she kept about $ 1,500 to $ 1,600 for Manna, and that Mr. Kang usually carried $ 200 to $ 300. The revenue agent also asked about loans, gifts, and inheritances that had been deposited, but Mrs. Kang did not tell her about any loans or any other cash on hand. The revenue agent reviewed petitioners' records in an effort to identify and eliminate other nonincome deposits. After respondent had issued the statutory notice, petitioners provided records of loans, schedules of deposits, and a schedule of cash on hand. Mrs. Kang worked over 150 hours in the evenings of the month preceding the trial to prepare the schedules of deposits and the schedule of cash on hand. Petitioners had two bank accounts that were active during all 3 years in question (the Manna account and the personal account) and three accounts that were active only during 1987 (the Interfirst I, II, and III accounts). The only summary of deposits provided to the Court is incomplete and contains transposition and footing errors. The recalculated amounts of petitioners' *616 total deposits are as follows: 1987
1988
1989
Total bank deposits
[1] $ 178,639
[2] $ 152,387
[2] $ 124,060
In addition to the amounts deposited, petitioners withheld cash from deposits and made expenditures with undeposited receipts. The amounts of withheld cash and undeposited receipts were as follows: 1987
1988
1989
Cash withheld from deposits [1]
-0-
$ 3,075
-0-
Expenditures with
undeposited receipts:
Manna
$ 11,370
11,240
$ 11,987
Remodeling
3,577
2,100
3,993
Total undeposited receipts
14,947
16,415
15,980
Respondent has agreed that certain deposits were not gross receipts and has made the following reductions to petitioners' *617 bank deposits: 1987
1988
1989
Transfers
$ 17,500
$ 2,700
$ 15,335
Rent receipts
3,010
2,650
-0-
Proceeds from house sale
-0-
17,609
-0-
Gifts
-0-
2,965
-0-
Credit card cash advance
-0-
3,000
-0-
Insurance reimbursement
-0-
-0-
595
20,510
28,924
15,930
In addition to respondent's adjustments, other deposits were transfers, rent receipts, gifts, and insurance reimbursements. The following schedule shows the corrected reductions to petitioners' bank deposits for these deposits: 1987
1988
1989
Transfers
$ 28,446
$  3,900
$ 16,235
Rent receipts
3,010
3,750
-0-
Proceeds from house sale
-0-
17,609
-0-
Gifts
-0-
3,700
-0-
Credit card cash advance
-0-
3,000
-0-
Insurance reimbursements
-0-
515
882
31,456
32,474
17,117
Petitioners transferred money for a variety of reasons. When a certificate of deposit matured, the proceeds were deposited into another account. When money was needed to repay a loan or put a deposit on a house, money was taken out of savings and deposited into checking. However, most of petitioners' transfers were between the personal account and the Manna account. Similar to many small business *618 proprietors, Mrs. Kang generally drew a monthly "wage" from the business. She also "reimbursed" herself when she used checks drawn on the personal account to purchase Manna supplies, and she transferred money into the Manna account when the business needed cash. In November 1984, Mrs. Kang visited South Korea and returned to the United States with her parents (Mr. and Mrs. Lee) and $ 19,000 of the dress shop proceeds. In March 1986, her brothers emigrated to the United States from South Korea and brought the balance of the dress shop proceeds, $ 20,000. The money was brought into the United States in the form of cash and traveler's checks. Because petitioners were afraid to deposit such a large amount of cash or traveler's checks, they did not immediately deposit this money into their bank accounts. Instead, they kept it in their home (cash hoard) or lent it to other Korean-Americans in their community. Petitioners slowly depleted the cash hoard. They spent some of the cash, but they deposited most of it into their bank accounts, either directly or when their borrowers repaid loans. Mrs. Kang did not keep contemporaneous records of the cash hoard, but she did prepare a schedule *619 of cash hoard transactions for the trial. The schedule was prepared from bank records, loan records, and memory, and was supplemented by Mrs. Kang's testimony. On January 1, 1987, petitioners had approximately $ 24,000 [1] remaining in the cash hoard. The amounts of cash taken from the cash hoard and deposited into bank accounts totaled $ 5,400 in 1987, $ 3,900 in 1988, and $ 4,715 in 1989. Petitioners lent money to other Korean-Americans from the cash hoard and their bank accounts. Private loans are common in the Korean-American community, where recent immigrants find it difficult to obtain bank loans and established community members feel duty-bound to provide financial help to new members. Risk of default is reduced by the shame that default would bring, not only on the borrower, but also on the borrower's family. As borrowers repaid their loans from *620 petitioners, petitioners deposited most of the repayments into their bank accounts. A few repayments were returned to the cash hoard. Petitioners also borrowed money, which was generally deposited into their bank accounts. Although none of the loans made by petitioners were evidenced by notes, Mrs. Kang made and kept contemporaneous records of most of the loans and occasionally held personal property as collateral. On January 1, 1987, one $ 10,000 loan was outstanding. In 1987, 1988, and 1989, petitioners deposited loan proceeds and repayments totaling $ 14,600, $ 7,400, and $ 6,400, respectively. [2]
Mrs. Kang generally charged interest, but if the borrower was a friend, she generally did not charge interest. For the years 1985 through 1989, petitioners reported only interest income received from banks and credit unions. Petitioners reported total interest income of $ 2,824 for 1985, $ 732 for 1986, $ 166 for 1987, $ 80 for 1988, and $ 20 for 1989. *621 [3] Petitioners collected an additional $ 1,100 of interest income in 1987. Of the $ 3,100 deposited into the Interfirst III account on May 27, 1987, $ 100 was interest income, and of the $ 20,000 placed in the cash hoard in December 1987, $ 1,000 was interest income. At the beginning of 1987, petitioners owned a house in Carrollton, Texas (the Carrollton house). During the year, they purchased and moved into a house in Plano, Texas (the Plano house), and rented the Carrollton house to Mrs. Kang's brothers. On July 1, 1987, petitioners deposited $ 1,000 received as earnest money from Mr. Kim on a contract to sell *622 the Carrollton house. They refunded $ 800 of the earnest money on October 4, 1988. On November 19, 1987, petitioners deposited $ 2,000 of earnest money received from Mr. Sung but refunded it 4 days later. On August 22, 1988, petitioners deposited $ 1,000 of earnest money received from Young Koo Lee, [4] and on September 23, 1988, they sold the Carrollton house to Mr. Lee. From 1984 until 1990, Mrs. Kang's parents, Mr. and Mrs. Lee, lived with petitioners. During that time, petitioners provided Mr. and Mrs. Lee with food and clothing, took care of their general needs, and claimed them as dependents. Once Mrs. Kang's parents started to receive government assistance, they reimbursed petitioners for a share of household expenses, and petitioners stopped claiming them as dependents. At various times, Mrs. Kang's brothers, O Bong Lee, Mal Bong Lee, and Cha Bong Lee, also lived *623 with petitioners, although not as long as their parents did. Petitioners did not claim the brothers as dependents. After petitioners moved into the Plano house, the brothers rented the Carrollton house and paid rent of approximately $ 600 per month (see supra p. 8). Petitioners reported rental income of $ 600 per month and took rental deductions for various house expenses, including depreciation, none of which is at issue. Petitioners also helped Mrs. Kang's brothers in other ways. When one of the brothers did not have a bank account, petitioners would pay his bills by check, and he would reimburse petitioners. As with many family transactions of this sort, petitioners did not keep a record of these transactions, and the brothers' reimbursements were often approximate. Petitioners also exchanged checks with Mrs. Kang's brothers, usually when a brother wished to cash a check drawn on an out-of-town bank. The following amounts of family transactions are not gross receipts and reduce total bank deposits: 1987
1988
1989
Parents
-0-
-0-
$   820
Cha Bong Lee
$ 620
-0-
-0-
O Bong Lee
-0-
-0-
1,264
620
-0-
2,084
Although Mrs. Kang sold her tailor shop *624 for $ 10,000 in 1986, petitioners did not receive any payments during 1986. They elected out of the installment method of accounting, and reported the entire gain from the sale on their 1986 income tax return. In 1987, the buyer paid Mrs. Kang $ 6,000, of which $ 2,000 was deposited into the bank and $ 4,000 placed in the cash hoard. [5]
During 1989, several other nonincome deposits were made to petitioners' bank accounts. On March 14, 1989, petitioners deposited a $ 148 refund check from Lakeland Tours, Inc., into their personal account. On April 19, 1989, Firstcity Bank reversed an erroneous $ 20 charge to the personal account. On May 15, 1989, petitioners deposited a $ 416 refund check from Montgomery Ward into the Manna account. Mrs. Kang purchased some of Manna's food and supplies from Sam's Wholesale Club. Although Mrs. Kang provided the revenue agent with canceled checks that were *625 payable to "Sam's", she did not provide a receipt for every check. Respondent disallowed the deduction with respect to each check for which Mrs. Kang did not provide a receipt. Petitioners failed to substantiate purchases of $ 9,336 for 1987, $ 284 for 1988, and $ 1,282 for 1989. Based on petitioners' concessions and the above findings, the correct adjustments to income are as set forth below: 1987
1988
1989
Interest income
$   1,100 -0-
$    335
Combined gross receipts
[1] 31,798 [2] $ 36,007
[3] 26,603
Wife's Schedule C:
Purchases
9,336 284
1,282
Depreciation
6,025 78
78
Wage expense
12,000 -0-
-0-
Wife's reported W-2 wages
(12,000)
-0-
-0-
Husband's Schedule C:
Expenses
1,351 2,720
5,713
Capital gains and losses
-0- 9,906
-0-
Other income
-0- 200
-0-
Total adjustments
49,610
49,195
34,011
OPINION When the Internal Revenue Service audits a taxpayer's return, the taxpayer should *626 provide the auditor with a paper trail; transactions should be documented, contracts provided, and expenses substantiated. Oral assurances are suspect, and if satisfactory records are not provided, the auditor will try to verify the taxpayer's contentions by recourse to an indirect method. 1 Audit, Internal Revenue Manual (CCH), sec. 820, at 7245-27. The paper trail in this case was inadequately marked, so respondent charted her course using bank records. We have found, after retracing the trails reconstructed by the parties, that neither party arrived at the correct adjustments to taxable income, and that petitioners' additional taxable income was less than determined by respondent, but more than conceded by petitioners. The multiplicity of categories of income and nonincome sources, and of deposits within each category, has made it difficult to provide a coherent narrative and include the necessary detail. To segregate and organize the necessary deposit-by-deposit detail, we have provided appendices. Each year has been segregated. Appendix A details 1987; appendix B details 1988; and appendix C details 1989. Within each appendix, schedule 1 summarizes the redetermined adjustments; *627 schedule 2 groups deposits and provides deposit-by-deposit detail; schedule 3 lists deposits in issue that were found to be income; and schedule 4 lists deposits that petitioners initially alleged were not income, but either did not explain or conceded. Issue 1. Use of the Bank Deposits Method
Taxpayers must keep records that can be used to establish their gross income. DiLeo v. Commissioner, 96 T.C. 858, 867 (1991), affd. 959 F.2d 16 (2d Cir. 1992); sec. 1.6001-1(a), Income Tax Regs. If a taxpayer's records do not clearly reflect income, the Commissioner may calculate the taxpayer's income using a method that in her opinion does clearly reflect income. Sec. 446(b); Menequzzo v. Commissioner, 43 T.C. 824, 831 (1965). The tax on a joint return is calculated on the aggregate income of the husband and wife. Sec. 6013(d)(3). Therefore, when their records do not clearly reflect their aggregate income, the Commissioner may calculate the taxpayers' income using a method that in her opinion does clearly reflect their income. Although respondent's agent found Manna's records to be fairly *628 accurate, the agent could not calculate petitioners' aggregate income because petitioners did not provide Remodeling's records. Even if the taxpayers' tax returns are consistent with their books and records, the Commissioner has considerable freedom to select a method to test for unreported income, Holland v. United States, 348 U.S. 121, 131-132 (1954); Campbell v. Guetersloh, 287 F.2d 878, 880 (5th Cir. 1961), and the bank deposits method is a longstanding court-recognized method to recompute income, Marcello v. Commissioner, 380 F.2d 494, 496 (5th Cir. 1967), affg. in part, revg. in part, and remanding in part T.C. Memo. 1964-302; Estate of Mason v. Commissioner, 64 T.C. 651, 656 (1975), affd. 566 F.2d 2 (6th Cir. 1977). "The rule is well established in civil cases that the computation made by the Commissioner shall be presumed correct." Price v. United States, 335 F.2d 671, 678 (5th Cir. 1964); Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). *629 Respondent's use of the bank deposits method does not annul the presumption of correctness, Webb v. Commissioner, 394 F.2d 366, 372 (5th Cir. 1968), affg. T.C. Memo. 1966-81, and petitioners must still prove by a preponderance of the evidence that respondent's determination is incorrect, Carson v. United States, 560 F.2d 693, 695-696 (5th Cir. 1977). Petitioners argue that respondent is not entitled to use the bank deposits method, or, if respondent is permitted to use the bank deposits method, that the burden of proof is shifted to respondent. In so arguing, they rely on several cases, including Holland v. United States, supra, United States v. Slutsky, 487 F.2d 832 (2d Cir. 1973), and United States v. Riganto, 121 F. Supp. 158 (E.D. Va. 1954). Petitioners' reliance on these cases is misplaced; they were criminal prosecutions for tax evasion that "are not apposite because of the greater burden of proof imposed upon the Government in that class of cases." Price v. United States, supra at 677. *630 Only where respondent's determination is without rational basis or is arbitrary will it not be afforded the presumption of correctness. Helvering v. Taylor, 293 U.S. 507, 513-514 (1935); Llorente v. Commissioner, 74 T.C. 260, 264 (1980), affd. in part, revd. in part and remanded 649 F.2d 152 (2d Cir. 1981). A determination is without rational basis where no substantive evidence links the taxpayer to the income-producing activity, Weimerskirch v. Commissioner, 596 F.2d 358, 360 (9th Cir. 1979), revg. 67 T.C. 672 (1977), or to the receipt or expenditure of funds, Tokarski v. Commissioner, 87 T.C. 74, 76 (1986). A determination is arbitrary where respondent's computations are internally inconsistent, Welch v. Commissioner, 297 F.2d 309, 311 (4th Cir. 1961), revg. and remanding T.C. Memo. 1960-163, or where respondent offers no direct evidence but rests entirely on the burden of proof, Llorente v. Commissioner, supra at 264. *631 Respondent linked petitioners to income producing-activities and to the money deposited into their accounts. Respondent subtracted known nonincome deposits from the total bank deposits and provided direct evidence supporting her determination. Although petitioners showed that some deposits were not income, that showing does not invalidate respondent's use of the bank deposits method. Marcello v. Commissioner, supra at 497; Estate of Mason v. Commissioner, supra at 658. Issue 2(a) Bank Deposits -- Generally
Although bank deposits are presumed to be income, the presumption is not conclusive, Estate of Mason v. Commissioner, supra at 656, and several adjustments are made to arrive at gross income. First, total deposits include only those deposits made during the year in issue. When total deposits are calculated from bank statement totals, prior and subsequent year deposits are subtracted.[6] Second, undeposited cash receipts, such as cash spent before being deposited, are added to total deposits. Marcello v. Commissioner, supra at 496-497 n.4. *632 Third, total deposits are decreased by nonincome deposits. Examples of nonincome deposits include loan proceeds, loan repayments, gifts, cash on hand at the beginning of the year, insurance proceeds, redeposits, and transfers from one bank account to another. Mallette Bros. Constr. Co. v. United States, 695 F.2d 145, 149 (5th Cir. 1983); United States v. Boulet, 577 F.2d 1165, 1167 (5th Cir. 1978); Marcello v. Commissioner, supra at 496-497 n.4; Price v. United States, supra at 677; Reaves v. Commissioner, 31 T.C. 690, 718-719 (1958), affd. 295 F.2d 336 (5th Cir. 1961). Because respondent is only reconstructing petitioners' business receipts, deposits of other types of income are also subtracted from total deposits. DiLeo v. Commissioner, 96 T.C. at 868; 1 Audit, Internal Revenue Manual (CCH), sec. 838, at 7247-6.
*633 Issue 2(b) Bank Deposits -- Evidentiary Issues
The examining agent testified that she did not have any problem communicating with Mrs. Kang during the audit and that she made her question about the cash hoard clear during the initial interview. However, we observed Mrs. Kang on the witness stand while she struggled to comprehend questions and to formulate answers. Mrs. Kang's testimony during the trial indicated that counsel for both parties had problems getting through to her, and we have concluded that Mrs. Kang understood the revenue agent's question to refer just to the amounts that were kept for the working capital needs of Manna and Remodeling, rather than all cash on hand. See 1 Audit, supra sec. 820 at 7245-27. Respondent would have us disregard all of Mrs. Kang's testimony and most of the exhibits she prepared. Although Mrs. Kang's testimony had some weaknesses and inconsistencies, we have found her generally to be a credible witness, and we attribute most of the inconsistencies to faulty memory rather than prevarication, as asserted by respondent's counsel. We have disregarded Mrs. Kang's testimony only where she did not offer any explanation for her assertion *634 that a specified deposit was not income. Where she explained why she classified a deposit as nonincome, we have considered other evidence and the reasonableness of her assertion to decide whether the deposit was not income. Mr. Kang provided no substantive testimony. Near the end of the trial, Mr. Kang testified (and it was obvious to the Court) that he did not speak English as well as Mrs. Kang and that he had only understood "half and half" of her testimony. In any event, Mrs. Kang handled the family's finances, so his knowledge of the facts of the case, which focused on the proper application of the bank deposits method, was necessarily limited in scope. For a month prior to trial, Mrs. Kang worked over 150 hours during the evenings preparing schedules for trial. Using her records, bank statements, and memory, Mrs. Kang scheduled every bank deposit that had been made during the 3 years in issue. She did the same for the cash hoard transactions. Because Mrs. Kang prepared her cash hoard statement and her schedules of deposits for the trial, we have treated them as testimony and have given them less weight than contemporaneously prepared records. Respondent points out several *635 errors on the cash hoard statement, and Mrs. Kang admitted that it is not 100 percent accurate. We have also found errors on the schedules of deposits but observe that Mrs. Kang classified nonincome deposits as income, as well as income deposits as nonincome. Although there are errors in the schedules, we have accepted the initial proposition, which was established by credible evidence, that petitioners had a cash hoard at the beginning of 1987 and deposited some of it into their bank accounts during each of the years in issue. For each year, petitioners conceded that certain deposits were gross receipts, and for each year, the amounts they conceded to be gross receipts exceeded the amount of gross receipts reported on their income tax return for that year. In addition, petitioners failed to explain the source of some deposits that they asserted were not gross receipts. Where petitioners failed to support their assertion, we have found that the deposit is properly included in business gross receipts. 1987
1988
1989
Total bank deposits
$ 178,639
$ 152,387
$ 124,060
Total undeposited receipts
14,947
16,415
15,980
Total cash receipts
193,586
168,802
140,040
Respondent:
Conceded on schedules
20,510
28,924
15,930
Deposits asserted to be
gross receipts at trial
173,076
139,878
124,110
Petitioners:
Conceded on schedules
109,909
86,149
77,323
Conceded undeposited
receipts [1]
14,947
15,839
13,145
Conceded or unexplained
at trial
[2] 3,263
[3] 309
[4] 456
Total deposits conceded to
be gross receipts
128,119
102,297
90,924
Deposits in issue
44,957
37,581
33,186
*636 On some of the checks that were deposited, the handwriting on the payee line was different from the handwriting on the other parts of the check. The trier of fact may identify handwriting by comparing it to specimens contained in another document, Fed. R. Evid. 901(b)(3), and may consider the distinctive characteristics of the handwriting in conjunction with the surrounding circumstances, Fed. R. Evid. 901(b)(4). United States v. Wylie, 919 F.2d 969, 978 (5th Cir. 1990). We have found that the nature of checks and deposit slips constitutes sufficient circumstances from which we may infer that petitioners' handwriting was on checks drawn on their accounts and on deposit slips evidencing deposits into their accounts. We have compared these exemplars with previously unidentified handwriting on checks deposited into petitioners' bank accounts in order to determine who completed the deposited checks. Issue 2(c) Bank Deposits -- the Cash Hoard
During the audit, Mrs. Kang told respondent's agent that on January 1, 1987, she had between $ 1,500 and $ 1,600 of cash on hand for Manna and that Mr. Kang usually carried between $ 200 and $ 300 of cash. *637 Petitioners provided no evidence that this cash was deposited during the years in issue, and we infer, from the nature of working capital, that petitioners maintained a relatively constant amount of cash on hand during the years in issue. Because the working capital was on hand January 1, 1987, was not deposited during the years in issue, and was on hand December 31, 1989, we have not included it in gross receipts. Petitioners did not tell respondent about the existence of the cash hoard until after respondent issued the notice of deficiency. We recognize the problematic character of a cash hoard claim and understand the reluctance of courts to accept taxpayers' unsubstantiated claims. Holland v. United States, 348 U.S. at 127; United States v. Boulet, 577 F.2d at 1169-1170; Marcello v. Commissioner, 380 F.2d 509, 511 (5th Cir. 1967), affg. T.C. Memo. 1964-304 and T.C. Memo. 1964-303; Reaves v. Commissioner, 31 T.C. at 718-719. However, in this case, Mrs. Kang provided passports with notations substantiating *638 that members of her immediate family brought $ 39,000 into the United States. She provided contemporaneous loan records to substantiate her testimony that she made loans from the cash hoard. She testified that she sold a dressmaking shop in Korea for $ 40,000. Although she did not provide direct evidence of the sale of the dress shop in Korea or the ownership of the imported funds, we have found that her testimony and the circumstantial evidence discussed above was sufficient to prove that on January 1, 1987, petitioners had a cash hoard of approximately $ 24,000 and an outstanding loan receivable of $ 10,000. We have found that deposits were not gross receipts if the schedule of deposits, the schedule of the cash hoard, and nature of the deposit are consistent with the deposited money having been taken from the cash hoard. We have included the deposit in gross receipts if Mrs. Kang's schedules are inconsistent, the item deposited was a third-party check, or the amount deposited was an odd amount. Respondent contends that it would be extremely difficult for petitioners to have saved the bulk of the money used to purchase Manna. While it may have been difficult, the record supports *639 petitioners' claim. On their 1985 income tax return, petitioners reported that they received $ 2,824 of interest income from banks and a credit union, and on their 1986 income tax return, they reported approximately one-quarter as much interest income, $ 732. These amounts of interest income indicate that petitioners had a significant amount of money in banks and the credit union. The drop in reported interest income is consistent with withdrawal of the bulk of their savings in April 1986, when petitioners purchased Manna. Respondent also points out that, although most of the money brought from South Korea was held in traveler's checks, very few of the deposits from the cash hoard were in traveler's checks. We do not find that observation significant because most of the cash hoard was deposited into bank accounts via repayments of loans that had been made from the cash hoard. Issue 2(d) Bank Deposits -- Loans
Deposits of loan proceeds and loan repayments are not income and must be subtracted from total bank deposits to arrive at business gross receipts. Mallette Bros. Constr. Co. v. United States, 695 F.2d at 149; United States v. Boulet, supra at 1167; *640 Price v. United States, 335 F.2d at 677. Mrs. Kang testified that when she lent or borrowed money, she recorded payments and repayments in her loan records. Because the language barrier made her testimony unclear, we are not sure that she recorded all payments and repayments. However, we have been persuaded that she lent money, borrowed money, and received repayments of money lent, and we place more reliance on the loan records than on the schedules prepared for the trial. Respondent contends that any resemblance between Mrs. Kang's loan ledger and actual transactions is "mere happenstance". We disagree and have found that the loan ledger and her testimony regarding the loans were generally accurate. Petitioners' failure to provide promissory notes is explained by the nature of the loans, the identity of the borrowers as members of the same Korean-America community as petitioners, and the community pressure to repay loans. Where Mrs. Kang recorded loans and repayments in contemporaneous loan records, we have accepted her characterization of related deposits, except where the circumstances indicate that the item deposited was more likely to have *641 been a payment for contracting work performed by Mr. Kang. Mrs. Kang's 1987 schedule of deposits shows two deposits, one to the Interfirst I account, and one to the Interfirst II account, as repayments of a loan to Kim Sung Hi and Koryo Jung. Although petitioners did not provide the Court with copies of the items deposited, the amounts and the dates of the deposits are consistent with the loan records. We do not find it significant that the schedule of the cash hoard shows $ 5,000 was lent whereas Mrs. Kang's testimony, the schedule of deposits, and the loan records, indicate $ 4,500 was lent. We have found that during 1987, petitioners lent $ 4,500 to Kim Sung Hi and Koryo Jung, and were repaid $ 4,500. For 1987, Mrs. Kang listed seven deposits to the Interfirst I account as repayments of a loan to Ahn Jung. Petitioners did not provide the Court with a copy of the items deposited for three of the deposits. One of the deposits was cash. Two of the deposits were third-party checks that were completed by the drawer, and one of the deposits was a third-party check on which the name of the payee was written by Mr. Kang. Although this loan is listed in the loan records, petitioners *642 failed to explain why the drawers of the deposited checks were not the debtor and why the drawers change with each deposit. We have found that these deposits were gross receipts. Mrs. Kang's 1988 schedule of deposits showed two deposits to the personal account as loans from Mr. Chang. The first deposit was on January 11, 1988, for $ 3,500. The deposited check was drawn on the House of 1776, for which Mr. Kang had done remodeling work. Petitioners did not attempt to establish a relationship between Mr. Chang and the House of 1776, nor did they offer an explanation why the payee line of the check was completed by someone other than the person who completed the rest of the check. Although the loan was listed in the loan records, petitioners presented no evidence that they repaid the loan, and we have found that this deposit was gross receipts. The second deposit alleged to be a loan from Mr. Chang was made on June 6, 1988, for $ 5,000. This loan was listed in the loan records and was supported by a check drawn on the personal account on June 8, 1988, for the same amount with the memo "pay back Mr. Chang". Although petitioner did not provide us with a copy of the item(s) deposited, *643 we have found that this deposit was not gross receipts. For 1988, Mrs. Kang listed seven deposits as repayments of a loan to Kwon Dong. Petitioners did not provide the Court with a copy of the items deposited for two of the deposits. Five of the deposits were third-party checks, all of which were completed by the drawer. Although this loan is listed in the loan records, petitioners failed to explain why the drawers of the deposited checks were not the debtor and why the drawers change with each deposit. We have found that these deposits were gross receipts. On January 24, 1989, petitioners wrote a $ 10,000 check payable to M. B. Store Fixture. Petitioners did not testify about any loan to M. B. Store Fixture, and M. B. Store Fixture was not listed in the loan records. However, Mrs. Kang indicated on the schedule of deposits that two checks deposited on April 11, 1989, were repayments of the loan and that the remaining balance was $ 5,750. The first check was a bank check drawn for $ 2,000. Petitioners produced a copy of the check, but the copy is so illegible as to be useless. The second check is drawn by Member's Building Maintenance for $ 2,250. The check included a *644 memo "contract". Because petitioners have failed to provide sufficient evidence to show that these deposits were not income, we have found them to be gross receipts. On the 1989 schedule of deposits, Mrs. Kang listed two checks from Bong's Tailor as loans from Bong's Tailor. Although she testified that she repaid the $ 1,800 loan in 1990, the loan was not listed in the loan records, and she did not provide the Court with any evidence of repayment. We have found that these deposits were gross receipts. Mrs. Kang's schedule of deposits and her testimony indicate that in September 1989, she cashed a $ 5,000 check for Mr. Chang. On September 15, 1989, she deposited a $ 5,000 cashier's check payable to Duk Chang, and withheld $ 2,000 of cash from the deposit. On September 20, 1989, she wrote a $ 3,000 check payable to "cash" and included the memo "cash for Chang". We have found that the $ 5,000 check deposited on September 15, 1989, was not gross receipts. On January 24, 1989, petitioners wrote a $ 3,000 check payable to Texas Cafe. Petitioners did not give any testimony about a loan to Texas Cafe, and Texas Cafe was not listed in the loan records. However, on the schedule of *645 deposits, Mrs. Kang indicated that Texas Cafe "paid back" $ 500 on September 7, 1989, and that the remaining balance was $ 900. [7] The $ 500 check was drawn by Young Hur. On November 16, 1989, $ 900 of cash was deposited, and on the schedule of deposits, Mrs. Kang indicated that this was "Mr. Hur pay in back", and that the remaining balance was zero. Although petitioners offered no direct evidence showing a relationship between the Texas Cafe and Mr. Hur, we infer from the schedule of deposits that a relationship exists. We have found that the $ 500 check and the $ 900 deposit were not gross receipts, but that the $ 1,600 check was gross receipts. Issue 2(e) Bank Deposits -- Interest
*646 Because respondent used the bank deposits method only to recreate petitioners' gross business receipts, interest income is subtracted from total bank deposits. DiLeo v. Commissioner, 96 T.C. at 868; 1 Audit, Internal Revenue Manual (CCH), sec. 838, at 7247-9. Where we have found a deposit to be interest income, we have not included it in business income but have added it to interest income. Mrs. Kang's loan records and her testimony indicate that during 1987 she lent $ 5,000 to Kim Young Sung and was repaid $ 5,100. We find $ 100 was interest income. Although the record is less clear in regard to $ 20,000 placed in the cash hoard in December 1987, we find that $ 19,000 was principal, and $ 1,000 was interest income. Issue 2(f) Bank Deposits -- Transfers
Transfers from one bank account to another bank account are not income and are subtracted from total deposits to calculate gross receipts. Mallette Bros. Constr. Co. v. United States, 695 F.2d at 149; United States v. Boulet, 577 F.2d at 1167. Where a deposited check is drawn on one of petitioners' accounts, the amount withdrawn *647 was either in the bank on January 1, 1987, or was previously included in income, as were transfers from savings to checking. We have therefore found that checks drawn on petitioners' accounts and payable to petitioners or Manna are "transfers" and not gross receipts. This holds true regardless of whether the check was deposited into another account or was deposited into the same account on which it was drawn. Because third-party checks cannot have been previously deposited into petitioners' accounts, they cannot be transfers. Where cash was deposited, we have also found the deposit was not a transfer, unless petitioners showed that the cash had been withdrawn from one account and then contemporaneously deposited into another. During 1987 and early 1988, Mrs. Kang drew "wages" of $ 900 each month to pay bills and living expenses. [8] The checks were drawn on the Manna account and deposited into the personal account. Respondent properly reduced total deposits by deposits that Mrs. Kang listed as transfers from the Manna account and that corresponded to checks drawn on the Manna account. Respondent properly did not reduce total deposits for two other $ 900 deposits that Mrs. Kang *648 mistakenly listed as transfers from the Manna account. The two deposits were checks drawn on a third party's account. However, Mrs Kang listed two other deposits as income that were actually checks drawn on the Manna account. On March 30, 1987, Mrs. Kang deposited Manna check #1393 into the Interfirst III account. On September 8, 1987, she deposited $ 900 into the Interfirst I account, and on the next day, Manna check #1545 for $ 900, payable to Cathy Kang, [9] cleared the Manna account. Both of these deposits were transfers. *649 In her schedule of deposits, Mrs. Kang indicated that the deposit to the Interfirst I account on March 19, 1987, included a $ 350 check drawn on the Manna account. Although she did not provide the deposit slip or copies of the items deposited, a $ 350 check payable to Nam Sik Kang cleared the Manna account at First City Bank on March 23, 1987. We have therefore found that $ 350 of the deposit was a transfer. Mrs. Kang's schedule of deposits indicated that the $ 5,000 deposit to the Interfirst I account on April 16, 1987, was a transfer from the Interfirst III account. She did not provide the deposit slip or copies of the item(s) deposited, but the bank statement for the Interfirst III account shows that $ 5,000 was withdrawn on April 16, 1987. We have therefore found that this deposit was a transfer. Mrs. Kang listed several other deposits as transfers, but these deposits consisted of either cash or checks drawn on third-party accounts. Although the money deposited may have been taken out of Manna's receipts and "transferred" to the personal account (or vice versa), Mrs. Kang did not deposit the money into a bank account before transferring it. Because these "transfers" had *650 not previously been deposited into a bank account, they had not yet been included in gross receipts under the bank deposits method. Therefore, the money has been included in gross receipts when deposited into a bank account. Likewise, expense "reimbursements" that were paid in cash or by third-party check were gross receipts because the money had not previously been deposited into petitioners' accounts. In addition to the two deposits of "wages" discussed above, (see supra p. 31) Mrs. Kang listed two other deposits as income that were actually transfers. On June 12, 1987, petitioners closed out the Interfirst II account and deposited check #1160, $ 296, into the Interfirst I account. On July 1, 1987, $ 3,500 was withdrawn from the Interfirst III account and deposited to the Interfirst I account. Issue 2(g) Bank Deposits -- Rent
Petitioners lived in the Carrollton house until they purchased the Plano house. Petitioners did not promptly sell the Carrollton house, but instead rented it to Mrs. Kang's brothers. The parties have agreed that rent receipts have been properly reported on Schedule E and should be subtracted from total deposits when determining petitioners' *651 business gross receipts. The parties have not agreed which deposits were rent. Mrs. Kang listed five payments, varying from $ 560 to $ 650, deposited from July 1987, to December 1987. No deposit was shown in November 1987. For 1988, Mrs. Kang listed eight deposits varying from $ 100 to $ 850. Respondent subtracted all five 1987 deposits from total deposits, but disputed three of the 1988 deposits. The first of the disputed deposits was made on May 19, 1988, and included a check drawn by Forum Cobbler payable to Nam Sik Kang. However, "Nam Sik Kang" on the payee line of the check is written in handwriting different from the other parts of the checks. We have found that Mr. Kang completed the payee part of the check after he received the check from Mrs. Kang's brother. Mrs. Kang labeled the second disputed deposit as "cash hand & rent" on her schedule of deposits, but she did not provide a breakdown between the cash hoard and rent. We find $ 600 of the June 11, 1988, deposit was rent and the balance was withdrawn from the cash hoard. The third disputed deposit was a check, drawn by Myung Bo Store Furniture Co. (Myung Bo), made payable to Nam Sik Kang, and did not include *652 any memo. The check was deposited to the personal account on August 17, 1988, and appears to have been completed by the drawer. Four other checks from Myung Bo were deposited in the months just prior to and just after the disputed check. Three of those other checks were classified as deposits of income by Mrs. Kang, and all three of them included memos indicating that they were for contracting work. The fourth check was deposited on January 28, 1988, was classified as rental income, and did not include any memo. Although respondent conceded that the check deposited on January 28, 1988, was rental income, we have not been persuaded that the check deposited on August 17, 1988 was rental income. We have found that the August 17, 1988, deposit was income earned by Mr. Kang. Issue 2(h) Bank Deposits -- House Deposits and Sale
An earnest money deposit, received on the execution of a sales contract, is not income until the taxpayer acquires an unconditional right to retain the deposit. Bourne v. Commissioner, 62 F.2d 648, 649 (4th Cir. 1933), affg. 23 B.T.A. 1288 (1931); Rev. Rul. 69-93, 1969-1 C.B. 139. *653 If the sale is consummated, it fixes the seller's right to retain the deposit, and the earnest money is included as part of the sales proceeds. Kellstedt v. Commissioner, T.C. Memo. 1986-435. If the sale is not consummated, the sales contract fixes the seller's right to retain the deposit, and the deposit is included in income at the time that the contract fixes the seller's right to retain the deposit. Baird v. United States, 65 F.2d 911, 912 (5th Cir. 1933). Because earnest money is in the nature of a payment for an option, it is included in the seller's ordinary income when it is forfeited to him. Sec. 1234; Elrod v. Commissioner, 87 T.C. 1046, 1068-1069 (1986). Because respondent used the bank deposits method to reconstruct petitioners' gross business receipts, deposits relating to the sale of the Carrollton house should be subtracted from total deposits and either completely excluded from income (if refunded), included in other income but not business receipts (if forfeited), or included as sales proceeds (if the sales contract is executed). Respondent reduced the 1988 bank deposits *654 by the proceeds from the sale of the Carrollton house. However, she did not reduce bank deposits by earnest money paid by potential buyers. Mrs. Kang testified that she received $ 5,000 as earnest money. Because she was confused about who had paid and when they had paid, we have found that petitioners deposited $ 4,000 of earnest money. We have also found that one deposit was completely refunded, that a second deposit was partially refunded, and that a third deposit was properly included in the calculation of gain shown on the statutory notice. Mrs. Kang testified that the August 22, 1988, deposit into the personal account was a payment of earnest money on the Carrollton house. The $ 1,000 check was from Young Koo Lee, who purchased the house on September 23, 1988. Although the parties did not present evidence of whether this deposit is included in the capital gain calculation, they did provide us with the sales contract and the Form 2119 that was filed with the original return. The "selling price" shown on Form 2119 matches the "sales price" shown on the sales contract. The "gain on sale" shown on the Form 2119 is $ 9,900, and the capital gain shown on the deficiency notice *655 (and stipulated by the parties) is $ 9,906. Because of these similarities, we have found that the August 22, 1988, deposit was included in the sales proceeds amount used to calculate the 1988 capital gain. Mrs. Kang testified that the $ 2,000 check from Chan Eop Sung, deposited to the personal account on November 19, 1987, was earnest money from Mr. Sung. On November 23, 1987, one of petitioners wrote a $ 2,000 check to Kyung Boo Sung. We do not find the difference in names to be significant and find that the deposit was earnest money and that the money was completely refunded. Mrs. Kang testified that the February 9, 1987, deposit to the Interfirst I account was a payment of earnest money on the Carrollton house. We were not provided the deposit slip or copies of the item(s) deposited. Mrs. Kang indicated that $ 800 of the deposit was refunded, but she did not provide specific documentation of the repayment. Mrs. Kang testified that $ 1,000 of the July 1, 1987, deposit was also earnest money. She initially said the money was from Lee, but later in her testimony, she found the Lee deposit and said that this deposit was from Kim. The deposit included a $ 1,000 check from *656 John J. Kim. On October 4, 1988, one of petitioners wrote an $ 800 check payable to David Kim and included the memo, "earnest money back". Mrs. Kang testified that three people contracted to buy the house, and that two of them canceled. Because we have tracked two other people's deposits and one other refund, we have found that $ 1,000 of the July 1, 1987, deposit was earnest money from the Kims, and the February 9, 1987, deposit was gross receipts. We have also found that $ 800 of the earnest money was refunded. Petitioners received $ 1,000 from the Kims and returned $ 800. Mrs. Kang testified that the $ 200 difference was to reimburse for attorney costs. However, petitioners did not substantiate that claim, and respondent was not able to locate a payment to an attorney. We decline to allow a deduction. Although no contract was introduced as evidence, it is apparent that petitioners' rights to the earnest money were not fixed before they refunded it. Because petitioners received only a nominal payment and kept possession of the property, we have concluded that the earnest money was in the nature of an option to purchase the Carrollton property. The $ 200 is recognized as *657 ordinary income in 1988. Issue 2(i) Bank Deposits -- Family Transactions
Petitioners helped other family members. Mrs. Kang's parents lived with petitioners for 6 years. Mrs. Kang's brothers also lived with petitioners (and then rented the Carrollton house), although not for so long. Mrs. Kang also helped her brothers by writing checks to enable them to pay their bills. For this help, petitioners did not require strict repayment terms and accurate accounting. Instead, the family members helped each other as they were able. When Mrs. Kang's parents started to receive government assistance, they occasionally gave petitioners cash to help with family expenses. Petitioners allowed her brothers to pay rent on the Carrollton house as they were able and accepted reimbursements in rounded, approximate amounts. We recognize that members of a close family are often not motivated by strict economic considerations when they enter into transactions with each other. Respondent asserted that there was no business or personal reason for Mrs. Kang to swap checks with her brothers, and that the brothers' checks were income to petitioners. We have found that there was a reason to swap *658 checks. After swapping checks, Mrs. Kang's brother would have a local check that he could cash at Mrs. Kang's bank. Mrs. Kang testified that she paid her brothers' bills by check when her brothers did not have bank accounts. We have found that this was the arrangement when payments from the brothers were deposited to the personal account or the Interfirst I account. However, when the payments from her brothers were checks and were deposited to the Manna account, we have found that she gave her brother cash from the Manna cash register. Because these checks replaced cash that would have been included in gross receipts when deposited, these checks were gross receipts when deposited. Issue 2(j) Bank Deposits -- Sale of the Tailor Shop
Petitioners' 1986 tax return shows, and Mrs. Kang testified, that she sold her dress shop in 1986 for $ 10,000. By electing out of the installment method of accounting, petitioners elected to recognize the entire gain in 1986 and not to recognize gain when the subsequent installments were collected. Conners v. Commissioner, 88 T.C. 541, 544 (1987); sec. 15A.453-1(d), Temporary Income Tax Regs., 46 Fed. Reg. 10717 *659 (Feb. 4, 1980). The parties did not use a "paper contract". Mrs. Kang did not view the amount due on the sale as a loan and therefore did not record the amount due in her loan records. Although Mrs. Kang's testimony on the terms of the sale is confusing, she testified that she received only $ 6,000 of the purchase price, all in 1987. According to Mrs. Kang's testimony and schedules, she collected a $ 2,000 check and two or three cash payments totaling $ 4,000 in April 1987. The check was deposited into the personal account on April 7, 1987, and the cash was placed in the cash hoard. It is unclear whether the balance due was forgiven or defaulted, but no other deposits were classified as "tailor shop" payments. [10]
*660 Because there is evidence of the sale and we believe Mrs. Kang's testimony, we have found that the April 7, 1987, deposit was a payment from the sale of the tailor shop. Because petitioners did not elect the installment method, the gain from the sale was reported in the year of sale, 1986. Therefore, the deposit was not income when collected. Issue 3. Expense Substantiation
This issue also arises from petitioners' lack of business records. With respect to purchases for which petitioners did not provide receipts to support the checks written, respondent disallowed the deductions. To the extent of the amounts of expenditures shown on receipts subsequently supplied by petitioners to substantiate the checks written, we have allowed those expenditures as deductions. The parties stipulated that the only Manna deductions in issue were unsubstantiated checks payable to "Sam's" (Sam's checks). In the notice of deficiency, respondent disallowed deductions totaling $ 10,643 for 1987, $ 2,098 for 1988, and $ 5,420 for 1989. On the last day of trial, petitioners offered to introduce a stack of receipts (trial receipts) to substantiate the Sam's checks. The parties agreed to delay *661 the admission of the offered trial receipts so that they could match the trial receipts with the corresponding Sam's checks. The revenue agent compared the trial receipts to receipts she had seen during the examination. The parties stipulated that, if the revenue agent were to testify about the receipts, [11] she would say that she compared the trial receipts to the items already allowed as deductions and found that, except for $ 2,341 in 1989, [12] respondent had already allowed deductions for the amounts of all the trial receipts. No other evidence was introduced to substantiate the disallowed Sam's checks. We have matched the trial receipts with the Sam's checks included on a list, stipulated *662 to include "all checks written". Although the agent may have previously matched many of the trial receipts with Sam's checks, we have found that a substantial part of the amounts supported by receipts had not been allowed as deductions. We have disallowed as deductions only the Sam's checks that were on the check lists but were not fully substantiated by matching receipts. We have matched the 1987 Sam's receipts to the 1987 checks, and have found that $ 9,336 of checks payable to "Sam's" were not supported by receipts. We have matched the 1988 Sam's receipts to the 1988 checks, and have found that one Sam's check for $ 284 was not supported by receipts. We have matched the 1989 Sam's receipts to the 1989 checks, and have found that $ 1,282 of checks payable to "Sam's" were not supported by receipts. ssue 4. Sections 6653(a) and 6661 Additions to Tax
For the years 1987 and 1988, respondent determined additions to tax under section 6653(a). Section 6653(a) imposes an addition to tax equal to 5 percent of the underpayment if any part of an underpayment is due to negligence or intentional disregard of rules and regulations. Negligence is the failure to exercise due care *663 or the failure to act as a reasonable and prudent person. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Petitioners bear the burden of proving that respondent's determination of negligence is erroneous. Rule 142(a). Petitioners provided no evidence that their underpayments were not due to negligence or intentional disregard of rules or regulations. Reasonable and prudent persons would have kept adequate records and reported all their income. Subject to the Rule 155 computation pursuant to our redeterminations, respondent's determinations of section 6653(a) additions to tax for 1987 and 1988 are sustained. Respondent also determined additions to tax for substantial understatement under section 6661 for 1987 and 1988. If there is a substantial understatement of income tax for any taxable year, section 6661(a) imposes an addition to tax equal to 25 percent of the underpayment attributable to the understatement. An understatement is substantial if it exceeds the greater of 10 percent of the tax required to be shown or $ 5,000. Sec. 6661(b)(1)(A). An "understatement" is defined as the excess of the tax required to be shown on the return over *664 the tax actually shown on the return, but the understatement will be reduced if the taxpayer either had "substantial authority" for, or adequately disclosed, the tax treatment shown on the return. Sec. 6661(b)(2). Respondent's determination of the addition is presumed to be correct, and petitioners bear the burden of proving that they are not liable for this addition to tax. Rule 142(a). Petitioners provided no evidence to show that they had authority for their understatements, and their tax returns did not disclose their understatements. Accordingly, if the Rule 155 computation reveals that petitioners substantially understated their 1987 or 1988 tax liability, respondent's determinations of section 6661(a) additions to tax for either of or for both those years will be sustained. Issue 5. Section 6662 Addition to Tax
Respondent determined an addition to tax under section 6662 for 1989. If any portion of an underpayment is attributable to negligence, disregard of rules or regulations, or substantial understatement of income tax, an amount equal to 20 percent of the portion of the underpayment attributable to such negligence, disregard, or understatement, is added to *665 the tax. Sec. 6662(a). Petitioners bear the burden of proving that they are not liable for this addition to tax. Rule 142(a). The term "negligence" includes the failure to make a reasonable attempt to comply with the provisions of the Internal Revenue Code, and the term "disregard" includes any careless, reckless, or intentional disregard. Sec. 6662(c). Substantial understatement is defined in the same manner as in section 6661, supra p. 43. Sec. 6662(d). Petitioners provided no evidence that their underpayment was not due to negligence or that they did not disregard rules or regulations. Petitioners provided no evidence that they had authority for their understatement, and their tax return did not disclose it. Respondent's determination of a section 6662 addition to tax for 1989 is sustained; the amount of the addition will be computed by reference to the entire amount of the underpayment shown by the Rule 155 computation. Conclusion
This case illustrates the need for contemporaneous records, thorough documentation, written contracts, and expense substantiation. Most of the issues addressed at trial, in the post-trial supplementation of the record, and in the *666 Court's decision-making process recounted above could have been eliminated if petitioners had maintained and furnished more complete accounting records in a timely fashion. Decision will be entered under Rule 155. Appendix A-1 Schedule of 1987 Total Deposits and Summary of Adjustment
Account
Amount
First City Bank
Acct. No. 01766054 (Manna Account)
$  70,247 Acct. No. 0651448 (Personal Account)
Statement dates 11/9/87 - 1/26/88
19,057 Subsequent year deposits
(11,202)
Interfirst Bank
Acct. No. 15-8610-6 (Interfirst I)
Statement dates 12/10/86 - 1/27/88
84,334 Prior year deposits
(6,348)
Acct. No. 22-0468-3 (Interfirst II)
Statement dates 12/29/86 - 6/12/87
6,900 First Republic & Interfirst Bank
Acct. No. 6002-8175-8 (Interfirst III)
Statement dates 12/26/86 - 12/31/87
15,651 Total deposits
178,639 Agreed expenditures
with undeposited receipts:
Manna
11,370 Nam Sik Kang
3,577 Total cash receipts
193,586 Less nonincome deposits:
Transfers
28,446 See infra p.47
Rent receipts
3,010 See infra p.48
Cash hoard
5,400 See infra p.48
Loan proceeds and
repayments
14,600 See infra p.48
Family transactions
Cha Bong Lee
620 See infra p.49
House deposits
3,000 See infra p.49
Tailor shop proceeds
2,000 See infra p.49
Interest income
166 See infra p.49
57,242 Net deposits
136,344 Gross receipts per returns
104,546 Combined adjustment
31,798 *667 Appendix A-2 Schedule of 1987 Nonincome Deposits
Type of nonincome/
Date of
Description of
Account of deposit
deposit
Amount
item(s) deposited
Transfers:
Conceded to be
nonincome:
Manna account
01/20
$ 500
Interfirst I check #2650
03/03
500
Interfirst I check #2680
04/17
500
Interfirst I check #2714
Interfirst III
04/07
900
Manna check #1422
Interfirst I
01/17
900
No copy of item(s) deposited,
but 1/7 Manna check #1331 to
Cathy Kang
02/23
900
No copy of item(s) deposited,
but 2/5 Manna check #1361 to
Cathy Kang
05/17
900
Manna check #1448
06/11
7,000
Savings withdrawal slip from
Interfirst III account
attached to deposit slip
06/17
900
Manna check #1474
07/08
900
Manna check #1498
08/18
900
No copy of item(s) deposited,
but 8/3/87 Manna check #1520
to Cathy Kang
10/14
900
No copy of item(s) deposited,
but 10/6/87 Manna check #1568
to Cathy
Kang
11/16
900
No copy of item(s) deposited,
but 11/10/87 Manna check
#1590 to Cathy
Kang
Personal account
12/03
900
No copy of item(s) deposited,
but 12/1/87 Manna check
#1603 to Cathy
Kang
Deposits in issue found
to be nonincome:
Interfirst I
03/19
350
Manna check #1404 to Nam
Sik Kang, and cleared Manna
account on 3/27/87
04/16
5,000
No copy of item(s) deposited, but $ 5,000 was
withdrawn from
Interfirst III on 4/16/87
Reclassifying amounts
agreed to be income:
Interfirst III
03/30
900
Manna check #1393
Interfirst I
07/01
3,500
Savings withdrawal slip
from Interfirst III account
attached
to deposit slip
09/08
900
No copy of item(s) deposited,
but Manna check #1545
is not otherwise
shown as a transfer and
cleared Manna account
on 9/9/87
06/12
296
Interfirst II check #1160
closing the account
28,446
Rent from brother(s):
Interfirst I
07/06
$ 600
No copy of item(s) deposited
08/24
650
No copy of item(s) deposited
09/08
600
No copy of item(s) deposited
10/16
600
No copy of item(s) deposited
Personal account
12/14
560
No copy of item(s) deposited
3,010
Cash hoard:
Manna account
01/13
600
Cash deposit
02/04
400
Cash deposit
04/02
400
Cash deposit
08/29
500
Cash deposit
10/01
400
Cash deposit
10/22
600
Cash deposit
Personal account
11/09
2,000
Cash deposit
Interfirst I
06/16
500
Cash deposit
5,400
Loans & repayments:
Kim Sung Hi or Koryo Jung:
(Initial loan $ 4,500)
Interfirst I
03/19
1,500
No copy of item(s) deposited,
but agrees with
contemporaneous loan
records
Interfirst II
02/16
3,000
No copy of item(s) deposited,
but agrees with
contemporaneous loan
records
Maryann Lee:
(Initial loan $ 5,000)
Interfirst III
05/27
5,000
Cash deposit, and agrees
with contemporaneous
loan records
Kim Young Sung:
(Initial loan $ 5,000)
Interfirst II
04/23
2,000
No copy of item(s) deposited, but agrees with
contemporaneous loan
records
Interfirst III
05/27
3,100
Cash deposit, and agrees
with contemporaneous
loan records
14,600
Family transactions:
Cha Bong Lee:
Interfirst I
01/04
$ 300
No copy of item(s) deposited.
$ 300 Interfirst I check
#2631 payable to
Cha Bong Lee drawn on 1/5/87
01/17
20
No copy of item(s) deposited
05/10
300
No copy of item(s) deposited
620
House deposits:
Personal account
11/19
2,000
Drawer, Chan Eop Sung;
payee, Noon Sik Kang
Interfirst I
07/01
1,000
Drawer, John J. Kim;
3,000
payee, Nam Kang
Tailor shop:
Interfirst I
04/07
2,000
No copy of item(s)
deposited. Described
on schedule of deposits
as "Tailor shop";
also schedule of cash
hoard indicates $ 4,000
placed
in cash hoard in April 1987
Interest income:
Interfirst III
03/31
47
06/30
83
09/30
29
12/31
7
166
*668 Appendix A-3 Schedule of 1987 Deposits in Issue Found to be Income
Alleged nonincome/
Date of
Description of
Account of deposit
deposit
Amount
item(s) deposited
Transfer:
Manna account
01/09
$ 270
Mrs. Kang says transfer.
Drawer, Korean Church;
payee, Nam Sik Kang
09/01
200
Mrs. Kang says transfer.
Drawer, Kim Mo Lee;
payee, Manna Sandwich
Personal account
12/30
500
No copy of item(s)
deposited. Described
on schedule of deposits
as "Manna Sandwich"
but no check on the
list of Manna checks
Interfirst I
01/29
570
No copy of item(s)
deposited. Described on
schedule of deposits
as "Manna Sandwich"
but no check on the
list of Manna checks
Cash hoard:
Interfirst I
12/20
380
No copy of item(s)
deposited, and no record
of withdrawal from cash
hoard
Loans & repayments:
Ahn Jung:
Interfirst I
01/12
800
No copy of item(s) deposited
03/02
2,000
No copy of item(s) deposited
04/31
1,500
Drawer, Myong Lee; payee,
Nam Sik Kang (payee
completed by Mr. Kang)
05/17
1,500
Drawer, Amigo Grocery;
payee, Nam Sik Kang
06/25
1,900
Cash deposit
07/15
1,000
No copy of item(s) deposited
07/27
1,300
Drawer, Young Sewing
Company; payee, Nam Sik
Family transaction:
O Bong Lee:
Manna account
01/23
400
Drawer, O.B. Lee;
payee, Manna
Manna account
07/13
500
Drawer, O.B. Lee;
payee, Manna
House deposit:
Interfirst I
02/09
1,000
No copy of item(s) deposited
13,820
*669 Appendix A-4 Schedule of 1987 Deposits Unexplained at Trial or Conceded to be Income
Date of
Account of deposit
deposit
Amount
Description of item(s) deposited
Personal account
11/09
$ 200
No explanation. Drawer, Young's
Sewing Company; payee, Nam Sik Kang
Interfirst I
01/17
2
Schedule of deposits
described as "GMAC"
03/07
784
Illegible explanation on schedule of
deposits
03/07
290
Conceded to be income
05/10
87
Schedule of deposits described as
"Allstate"
Interfirst II
04/01
1,500
Conceded to be income
06/12
400
No explanation
3,263
Appendix B-1 Schedule of 1988 Total Deposits and Summary of Adjustment
First City Bank
Acct. No. 01766054 (Manna Account)
$ 51,227
First City Bank
Acct. No. 0651448 (Personal Account)
Statement dates 12/23/87 - 1/20/89
105,748
Prior year
(688)
Subsequent year
(3,900)
Total deposits
152,387
Cash withheld from deposits
3,075
Plus agreed expenditures
with undeposited receipts
Manna
11,240
Nam Sik Kang
2,100
Total cash receipts
168,802
Less nonincome deposits
Transfers
3,900
See infra p.53
Rent receipts
3,750
See infra p.53
Proceeds from house sale
17,609
See infra p.53
Gifts
3,700
See infra p. 54
Credit card advances
3,000
See infra p.54
Insurance proceeds
515
See infra p.54
Cash hoard
3,900
See infra p.54
Loan proceeds and payments
7,400
See infra p.55
House deposit
1,000
See infra p.55
44,774
Net deposits
124,028
Gross receipts per returns
88,021
Combined adjustment
36,007
*670 Appendix B-2
Sechedule of 1988 Nonincome Deposits
Type of nonincome/
Date of
Account of deposit
deposit
Amount
Transfers:
Conceded to be
nonincome:
Personal account
01/13
$ 900
02/16
900
03/15
900
Deposits in issue found
to be nonincome:
Manna account
01/18
500
07/18
200
11/07
500
3,900
Rent:
Conceded to be
nonincome:
Personal account
01/04
600
01/28
600
04/11
850
05/07
100
05/10
500
Deposits in issue found
to be nonincome:
Personal account
05/19
500
06/11
600
3,750
House sale:
Personal account
10/03
15,850
10/17
1,759
17,609
Type of nonincome/
Account of deposit
Description of item(s) deposited
Transfers:
Conceded to be
nonincome:
Personal account
Manna check #1624
No copy of item(s) deposited but
2/8 Manna check #1650 to Cathy Kang
No copy of item(s) deposited but
3/5 Manna check #1674 to Cathy Kang
Deposits in issue found
to be nonincome:
Manna account
Personal check #1046
Personal check #1204
Personal check #1315
Rent:
Conceded to be
nonincome:
Personal account
Drawer, O Bong Lee; payee, Cathy Kang
Drawer, Myung Bo Furniture Store;
payee, Nam Sik Kang
No copy of item(s) deposited
No copy of item(s) deposited
No copy of item(s) deposited
Deposits in issue found
to be nonincome:
Personal account
Drawer, Forum Cobbler;
payee, Nam Sik Kang
(payee completed by Mr. Kang)
Cash deposit
House sale:
Personal account
No copy of item(s) deposited
No copy of item(s) deposited
*671 Appendix B-2
Schedule of 1988 Nonincome Deposits (Continued)
Type of nonincome/
Date of
Account of deposit
deposit
Amount
Gifts:
Conceded to be
nonincome:
Personal account
08/26
$ 250
08/30
50
08/30
100
08/30
100
08/30
100
08/30
20
08/30
30
09/16
500
09/19
1,288
09/19
12
Deposits in issue found
to be nonincome:
Personal account
08/26
1,000
08/30
250
3,700
Credit card advance:
Personal account
08/17
1,000
08/17
2,000
3,000
Insurance proceeds:
Personal account
08/26
515
Cash hoard
Personal account
04/15
300
04/18
300
06/11
900
06/21
300
07/22
500
08/03
600
08/18
500
10/04
500
3,900
Type of nonincome/
Account of deposit
Description of item(s) deposited
Gifts:
Conceded to be
nonincome:
Personal account
Drawer, Forum Cobbler; payee, Kang,
Nam Sik (payee completed by Mr. Kang)
Drawer, Hang Kee Kim; payee,
Cathy Kang (payee completed by Mrs. Kang)
Drawer, Ko Am Corporation; payee,
Cathy Kang (payee completed by Mrs.
Kang)
Drawer, Dallas Auto Body; payee,
Cathy Kang (payee completed by Mrs. Kang)
Drawer, Young's Sewing Company;
payee, Nam Sik Kang (payee completed by
Mr. Kang)
No copy of deposited check
No copy of deposited check
Cash deposit
Cash deposit
Coin deposit
Deposits in issue found
to be nonincome:
Personal account
Cash deposit
Five $ 50 checks not copied
Credit card advance:
Personal account
American Express
American Express
Insurance proceeds:
Personal account
Drawer, Allstate Ins.
Cash hoard:
Personal account
Cash deposit
Cash deposit
Cash deposit
Cash deposit
Cash deposit
Cash deposit
No copy of item(s) deposited
Cash deposit
*672 Appendix B-2 Schedule of 1988 Nonincome Deposits (Continued)
Type of nonincome/
Date of
Account of deposit
deposit
Amount
Loan proceeds and
repayments:
Chang:
Personal account
06/06
$ 5,000
Check exchanges:
Personal account:
Son Chong
06/22
2,000
Jo Suk Jae
12/28
400
7,400
House deposit:
Personal account
08/22
1,000
Type of nonincome/
Account of deposit
Description of item(s) deposited
Loan proceeds and
repayments:
Chang:
Personal account
No copy of item(s) deposited. Personal
check #1183 for $ 5,000 dated
6/8/88 had a memo "pay back Mr. Chang"
Check exchanges:
Personal account:
Son Chong
No copy of item(s) deposited. On 6/24/88,
personal check #1189 payable
to Son Chong drawn for $ 2,000
Jo Suk Jae
Cash deposit. On 11/23/88, personal check
#1326 payable to Jo Suk Jae
drawn for $ 400
House deposit:
Personal account
Drawer, Young Koo Lee; Payee, Kathy Kang
Appendix B-3 Schedule of 1988 Deposits in Issue Found to be Income
Alleged nonincome/
Date of
Account of deposit
deposit
Amount
Transfer:
Manna account
04/06
$ 560
Personal account
07/15
900
10/26
1,100
12/15
270
Rent receipts:
Personal account
08/17
600
Gifts:
Personal account
09/07
750
Cash hoard:
Personal account
10/4-7
1,312
09/27
750
Manna account
01/13
800
Loans & repayments:
Chang:
Personal account
01/11
3,500
Kwon Dong:
Personal account
02/08
1,800
03/21
1,200
04/25
1,500
05/18
1,200
06/22
2,500
08/10
800
10/03
1,000
Family
transactions:
O Bong Lee:
Manna account
02/16
200
03/03
400
03/29
200
10/05
400
21,742
*673 Alleged nonincome/
Account of deposit
Description of item(s) deposited
Transfer:
Manna account
Drawer, Pearl Tang; payee, Cathy or Nam Kang
Personal account
Drawer, Young's Sewing; payee, Nam Sik Kang
No copy of item(s) deposited and schedule of
deposits indicates,
"Sandwich", but no check from Manna
Cash deposit. Schedule of deposits indicates
"Sandwich - paid Sam's"
Rent receipts:
Personal account
Drawer, Myung Bo Store Fixture Company; payee,
Nam Sik Kang
Gifts:
Personal account
Drawer, Myung Bo Store Fixutres; payee, Mr. Nam
S. Kang. Check memo on
check "contract labor"
Cash hoard:
Personal account
Cash deposit but most other withdrawals in
$ 100 increments
Drawer, Yang Giannini; payee, Cathy Kang
(payee completed by Mrs. Kang)
Manna account
Cash deposit, but no record of withdrawal
from the cash hoard
Loans & repayments:
Chang:
Personal account
Drawer, House of 1776; payee, Nam Sik Kang
(payee handwriting
unidentified). Check memo, "payment"
Kwon Dong:
Personal account
Drawer, House of 1776; payee, Nam Sik Kang.
Owner of House of 1776 says
check is a payment for services.
Drawer, Siam Barry; payee,
Kang. Check memo "6755",
same as 3/1 income check
Drawer, Young's Sewing; payee, Nam Sik Kang
Drawer, Young's Sewing; payee, Nam Sik Kang
No copy of item(s) deposited
Drawer, Korean Church of Dallas; payee,
Nam Sik Kang
No copy of item(s) deposited
Family
transactions:
O Bong Lee:
Manna account
Drawer, O Bong Lee; payee, Manna Sandwich
Drawer, O Bong Lee; payee, Manna Sandwich
Drawer, Tok Hui Amimi; payee, Kang
Drawer, Ralph Barry; payee, Kathy Kang
*674 Appendix B-4 Schedule of 1988 Deposits Unexplained at Trial
Date of
Description of
Account of deposit
deposit
Amount
item(s) deposited
Personal account
07/29
$ 300
No copy of item(s) deposited
& unexplained
Manna account
12/19
9
No explanation
309
Appendix C-1 Schedule of 1989 Total Deposits and Summary of Adjustment
First City Bank
Acct. No. 01766054 (Manna Account)
$ 42,588 First City Bank
Acct. No. 0651448 (Personal Account)
Statement Dates 12/20/88 - 1/19/89
86,323 Prior year
(2,600)
Subsequent year
(2,251)
Total bank deposits
124,060 Plus agreed expenditures
with undeposited receipts
Manna
11,987 Nam Sik Kang
3,993 Total cash receipts
140,040 Less nonincome deposits:
Transfers
16,235 See infra p.59
Insurance reimbursement
882 See infra p.59
Cash hoard
4,715 See infra p.59
Loan proceeds and
repayments
6,400 See infra p.60
Family transactions
Parents
820 See infra p.60
O Bong Lee
1,264 See infra p.60
Refunds
564 See infra p.61
Reversed bank charge
20 See infra p.61
30,900 Net deposits
109,140 Gross receipts per returns
82,537 Combined adjustment
26,603 *675 Appendix C-2
Schedule of 1989 Nonincome Deposits
Type of nonincome/
Date of
Account of deposit
deposit
Amount
Description of item(s) deposited
Transfers:
Conceded to be
nonincome:
Personal account
01/24
$ 15,335
Bank debit attached to
deposit slip
Deposits in issue found
to be nonincome:
Manna account
10/13
900
Personal check #1584
16,235
Insurance reimbursement:
Conceded to be
nonincome:
Personal account
05/30
211
Drawer, State Farm Mutual
06/01
192
Drawer, Allstate
06/09
192
Drawer, Allstate
Reclassifying amounts
agreed to be income:
Personal account
07/28
287
Drawer, [illegible] insurance
882
company
Cash hoard:
Personal account
06/13
300
Cash deposit
07/24
1,000
Cash deposit
07/25
300
Cash deposit
07/26
300
Cash deposit
07/28
500
Cash deposit
08/07
800
Cash deposit
08/23
500
Cash deposit
08/29
415
Cash deposit
09/25
300
Cash deposit
10/20
300
Cash deposit
4,715
Loans & repayments:
Mr. Chang:
Personal account
09/15
$ 5,000
Cashier's check payable to
Duk Chang, $ 2,000
withheld from
deposit and $ 3,000 personal
check #1562 payable
to "cash" dated
9/20/89, check memo,
"cash for Chang"
Mr. Hur/Texas Cafe:  (personal check  #1383, $ 3,000)
Personal account
09/07
500
Drawer, Young Hur;
payee, Cathy Kang
11/16
900
Cash deposit
6,400
Family transactions:
Parents:
Personal account
02/21
270
Cash deposit
09/27
300
Cash deposit
12/19
250
Cash deposit
820
O Bong Lee:
Personal account
06/05
200
Drawer, O Bong Lee;
payee, Cathy Kang
10/02
400
Cash deposit
10/10
429
No copy of item(s)
deposited
11/28
235
Cash deposit
1,264
Refunds:
Tour cancelation:
Personal account
03/14
$ 148
Drawer, Lakeland Tours
(refund account).
$ 165 personal check #1304
payable to Lake land
Tours drawn on 10/27/88
Montgomery Ward refund:
Manna account
05/15
416
Manna check #1886 drawn
for the same amount
on 5/1/89
564
Bank credit for
erroneous debit:
Manna account
04/19
20
*676 Appendix C-3 Schedule of 1989 Deposits Found to be Income
Alleged nonincome/
Date of
Account of deposit
deposit
Amount
Description of item(s) deposited
Transfers:
Manna account
11/28
$ 680
Mrs. Kang says transfer, but 6
checks deposited, none from
personal account
12/18
200
Mrs. Kang says transfer, but
cash deposit; no record in
personal account
Personal account
02/07
900
Drawer, Young's Sewing; payee,
Kang Carpentry
10/04
300
Cash deposit. Schedule of
deposits states "Store"
10/25
100
Drawer, Peking Chinese
Restaurant; payee, Mr. Kang. Schedule of deposits states
"Store pay back"
11/14
200
Cash deposit. Schedule of
deposits states "Store pay back
for Sam's 10/13"
Cash hoard:
Manna account
08/07
500
Cash and checks deposited.
Schedule of deposits
indicates "Cash Hand"
but not on schedule
of cash hoard.
Personal account
06/20
2,000
Cash deposit, but no record
of withdrawal on schedule
of cash hoard
Loans and repayments:
Bong's Tailor:
(no loan record)
Personal account
02/27
800
Drawer, Bong's Tailor; Payee,
Cathy Kang. Check
memo illegible
03/06
1,000
Drawer, Bong's Tailor; Payee,
Nam Sik Kang. Check
memo illegible
M. B. Store Fixture:
(personal check #1384,
$ 10,000)
Personal account
04/11
2,000
Bank check; payee, illegible
04/11
2,250
Drawer, Member's Building
Maintenance; payee, Kang's
Carpentry Co.
Check memo "contract"
Mr. Hur/Texas Cafe:
Personal account
09/07
1,600
Drawer, Young's Sewing;
payee, Nam Sik
Family transactions:
O Bong Lee
Manna account
03/10
432
No checks attached to
deposit slip
06/05
1,000
Drawer, Chu's Inc; payee, Cathy
Kang (payee completed
by Mrs. Kang)
09/07
220
No checks attached to
deposit slip
10/24
55
Drawer, Rita Jones; payee, Cathy
Kang (payee completed
by Mrs. Kang)
10/24
50
Traveler's check; payee, Cathy
Kang (payee completed
by Mrs. Kang)
10/24
8
Drawer, Buchanan; payee, Cathy
Kang (payee completed
by Mrs. Kang)
10/24
47
Drawer, Jeanne Udden; payee,
Cathy Kang (payee completed
by Mrs. Kang)
11/29
60
Drawer, DeFranceschi; payee,
Cathy Kang (payee completed
by Mrs. Kang)
Refunded:
Personal account
12/06
2,100
"Refunded" by Personal
check #1638
Cash advance:
Personal account
07/19
2,000
Drawer, Chu's Inc., payee,
Nam Sik. $ 3,000 Visa advance
on 7/18 placed in cash hoard
18,502
*677 Appendix C-4 Schedule of 1989 Deposits Unexplained at Trial
Date of
Account of deposit
deposit
Amount
Description of item(s) deposited
Manna account
08/15
$ 400
Cash deposit. No explanation
Personal account
02/21
30
No explanation
11/29
26
No explanation
456
Footnotes
1. See appendix A-1 for a schedule of deposits by bank account.↩
2. See appendix B-1 for a schedule of deposits by bank account.↩
2. See appendix C-1 for a schedule of deposits by bank account.↩
1. Petitioners withheld more cash from deposits than respondent included in her determination. We assume that respondent has either included the additional cash withheld in "Expenditures with undeposited receipts" or has conceded that the additional cash withheld was not includable in gross receipts.↩
1. Prior to Jan. 1, 1987, petitioners had used $ 5,000 from the cash hoard to purchase an automobile, and had loaned $ 10,000 from the cash hoard to Ahn Jung.↩
2. In 1987, $ 100 of the loan repayments was interest income.↩
3. Interest income of $ 166 was earned on the Interfirst III account during 1987. The interest income earned during 1988 and 1989 was not earned on either the Manna account or the personal account, and the parties have not provided evidence of any other accounts. For the purposes of this case, we have assumed that respondent conceded that any deposits into accounts not in issue are not gross receipts.↩
4. There is no evidence in the record that indicates whether Young Koo Lee is related to Mrs. Kang. We assume that he is not related to her.↩
5. No further payments were made, and the remaining amount due was either forgiven or defaulted, although when is unclear.↩
1. See appendix A-1 for detail of the 1987 combined gross receipts adjustment.↩
2. See appendix B-1 for detail of the 1988 combined gross receipts adjustment.↩
3. See appendix C-1 for detail of the 1989 combined gross receipts adjustment.↩
6. Alternatively, total deposits can be calculated by totaling the individual deposits made during the year.↩
1. Because Mrs. Kang scheduled deposits without adjusting for amounts withheld, these amounts differ from the amounts shown as undeposited receipts, supra p. 7↩. Some amounts withheld were withheld from deposits in issue; these amounts are addressed in connection with the underlying deposits.
2. See appendix A-4 for deposit-by-deposit detail.↩
3. See appendix B-4 for deposit-by-deposit detail.↩
4. See appendix C-4 for deposit-by-deposit detail.↩
7. The loan balance might be accounted for by a $ 1,600 check included in the Sept. 7, 1989, deposit that Mrs. Kang indicated was nonincome. However, she did not indicate why it was not income, and we have not inferred that it was related to the Texas Cafe loan, particularly because the drawer of the $ 1,600 check was Young's Sewing.↩
8. Respondent disallowed a deduction for "wage" payments from Manna to Mrs. Kang in 1987, and reduced petitioners' wage income by the same amount. See supra↩ p. 2. Although the deposits in question may have been previously included in those adjustments, we have considered them only to determine if they are transfers.
9. At trial, Mrs. Kang introduced herself as Cathy Kang. She also used "Cathy" in bank account names and on checks as drawer and indorsee.↩
10. The record does not show when and why the $ 10,000 purchase money loan was reduced to $ 6,000. Because we do not have sufficient facts, we cannot allow a bad debt deduction or other adjustment for the reduction of the purchase money loan with respect to a gain reported in an earlier year that was not before us.↩
11. Because the receipts were not shown to respondent until the last hour of the last day of trial, the revenue agent was not able to testify about the receipts at the trial.↩
12. Respondent concedes that petitioners are entitled to this additional deduction, leaving $ 3,079 of disallowed deductions in issue for 1989.↩